IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 2:19cr189 |
| | ) |
| JAVAID PERWAIZ, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING**

The United States of America, by and through the Acting United States Attorney, Raj Parekh, and Elizabeth M. Yusi, E. Rebecca Gantt, and John F. Butler, Assistant United States Attorneys, offers the following with respect to the sentencing factors under both the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") and 18 U.S.C. § 3553(a). The government has no objection to the Presentence Investigation Report (PSR), which correctly calculates the defendant's total offense level of 43 and has a recommended range under the Guidelines of 5,700 months[1]. As discussed below, the government is requesting a sentence of 50 years (600 months). Based on the sentencing factors under 18 U.S.C. § 3553, the government believes this sentence is sufficient but not greater than necessary to achieve the purposes of sentencing. In support of its position, the government states as follows:

**I.   BACKGROUND FACTS**

On June 19, 2020, the grand jury returned a sixty-two count superseding indictment against the defendant, JAVAID PERWAIZ ("defendant" or "PERWAIZ"). ECF No. 50. The

---

[1] The Guidelines range of Life is restricted because the maximum statutory sentences available is 5,700 months (Counts 1-7, 9-10, 17, 23, 25-26 = 13 Counts x 120 months = 1,560 months; Counts 8, 14-16, 18-22, 24 = 10 Counts x 240 months = 2,400 months; Counts 27-31, 33-40, 44-59 = 29 Counts x 60 months = 1740 months; 1,560 months + 2,400 months + 1,740 months = 5,700 months).

counts alleged violation of three statutes: Counts 1 through 26 charged the defendant with health care fraud, in violation of 18 U.S.C. § 1347, Counts 27 through 59 charged the defendant with false statements related to health care matters, in violation of 18 U.S.C. § 1035; and Counts 60, 61 and 63 charge the defendant with aggravated identify theft, in violation of 18 U.S.C. § 1028A. The indictment pertained to thirty-one patients of the defendant, an obstetrician-gynecologist, for services occurring between at least January 2010 and November 2019.

PERWAIZ proceeded to trial, which commenced October 13, 2020. The government presented dozens of witnesses and hundreds of exhibits. The defendant also presented a defense case, which included PERWAIZ testifying in his own defense over a period of two days. On Trial Day 18, on November 9, 2020, the jury returned a verdict of guilty on 52 counts. The defendant was found guilty on Counts 1 through 10, and 14 through 26, for health care fraud, in violation of 18 U.S.C. § 1347. The jury also found PERWAIZ guilty of health care fraud resulting in serious bodily injury in Counts 14, 15, 16, 18, 19, 20, 21, 22, and 24. The defendant was also found guilty on Counts 27 through 32, 34 through 40, and 44 through 59 charging the defendant with false statements related to health care matters, in violation of 18 U.S.C. § 1035. The jury was hung on Count 32 and acquitted the defendant on the remaining counts.

As the Court saw throughout the trial, PERWAIZ created and perpetrated the health care fraud scheme well before 2010. In fact, it occurred over decades since at least the early 1980s. There were four principal ways in which the defendant employed false and fraudulent means to obtain money from health care benefit programs between at least 2010 and 2019:

### A. Unnecessary Surgeries and Cancer Scares

First, PERWAIZ performed unnecessary gynecological diagnostic procedures (including hysteroscopies and colposcopies) and surgeries (including hysterectomies, dilation & curettages, and the removal of ovaries and fallopian tubes) on unsuspecting patients. In some instances, the defendant falsely told patients that if they did not undergo a hysterectomy, they would develop cancer, or that they had cancer and needed surgery immediately. PERWAIZ' removal of women's organs resulted in serious bodily injury. And, some of his unnecessary surgeries resulted in additional permanent injuries to his patients, including the inability to go to the bathroom normally, constant pain, and the inability to have sexual intercourse.

At trial, Dr. Jay Goldberg, an expert in gynecology and obstetrics, testified about his review of the patients' files and test results. He explained the standard of care, and how PERWAIZ was a complete deviant in how he proceeded in his practice and the invasive procedures he forced upon women. Also at trial, dozens of victims testified about the lack of complaints and symptoms they experienced, yet PERWAIZ documented otherwise in their medical files. Many also testified about the fear PERWAIZ instilled in them about their diagnosis or risk of cancer, which coerced them into having unnecessary surgeries. One example which the Court may recall is patient M.C. M.C. is a non-native English speaker, and had trouble understanding why PERWAIZ kept performing invasive gynecological procedures on her. In 2012, PERWAIZ convinced M.C. she needed a hysterectomy, and told the insurance company it was due to uterine prolapse. M.C. never had any symptoms of prolapse or pain, and the procedure was completely unnecessary. Even after the hysterectomy, PERWAIZ continued to do other unnecessary procedures on M.C.

Another example is D.A. After being told of an abnormal pap smear, which is a very common occurrence in gynecology, D.A. went to PERWAIZ for a follow-up appointment. PERWAIZ allegedly performed a colposcopy on D.A. PERWAIZ told D.A. she had precancerous cells and needed an immediate hysterectomy. D.A. agreed and proceeded to surgery. The surgery created debilitating pain and discomfort for D.A. and was completely unnecessary.

Patient N.B. was 41 years old and went to PERWAIZ for a routine exam. He then lied and told her she needed an emergent hysterectomy or she would get cancer. N.B. was under the knife within 3 days. As a result of the unnecessary surgery, N.B. now has pain and severe complications in going to the bathroom.

### B. Unnecessary Early Induction of Pregnant Women

PERWAIZ also routinely changed pregnant women's due dates and perform unnecessary, elective inductions when the women were prior to 39 weeks in gestation in order to make sure he was the physician to deliver the babies and then be paid by insurance. He did so not for any medical reason, but to untruthfully make it appear as though these patients were beyond 39 weeks of gestation when he induced their labor. Thus, the defendant ensured the appearance of compliance with the standard of care and medical necessity, while minimizing the chances that his patients would spontaneously deliver at a time when the defendant was not already scheduled to be at the hospital where he had privileges. In 2019 alone, PERWAIZ billed at least 33 of 84 deliveries to TRICARE and Medicaid for women who had been induced, without medical indication, prior to 39 weeks. Several of these patients testified at trial as well, and stated that if

they had not been pressured by PERWAIZ, they would have preferred to wait until their labor began on its own.

Two medical practitioners also testified as to PERWAIZ' earlier practices regarding early inductions. Dr. Dillender, a pediatric neonatologist, testified that in approximately 2007 or 2008, PERWAIZ' unnecessary early inductions resulted in babies requiring special care, which happened so frequently that it was known as the "Perwaiz special." And Diane Lee, a nurse whose career overlapped with PERWAIZ' for decades, discussed similar occurrences decades earlier.

### C. Fake Hysteroscopies and Colposcopies

PERWAIZ routinely billed for hundreds of thousands dollars of in-office, diagnostic hysteroscopies and colposcopies that he only pretended to perform. For the hysteroscopies, the hysteroscope was completely broken for long periods of time but PERWAIZ still billed for the alleged service. And throughout the entire time, PERWAIZ used no distending medium, so the procedure was worthless. For the colposcopy, PERWAIZ also did not use the required vinegar/acidic solution required for its use, thus making them worthless as well. He used fabricated results from both procedures in order to progress his patients to invasive and lucrative unnecessary, surgeries.

As a result of PERWAIZ' fraudulent diagnostic procedures, he was paid over $504,000 between 2010 and 2019.

### D. Falsified Sterilization Consents

PERWAIZ frequently pressured women to quickly undergo sterilization, typically bilateral tubal ligations (more commonly known as tube-tying). Medicaid requires a 30-day

written consent from women prior to sterilization. As Dr. Goldberg testified, this requirement was instituted, in part, to provide protection for vulnerable populations from coerced sterilization. PERWAIZ directed patients to leave the dates of the consent forms blank and to fill in the date himself at a later date, allowing him to bill Medicaid for sterilizations that he often performed the same week as his first patient visit. Many of the women who underwent sterilization procedures were not even patients of PERWAIZ 30 days prior to their irreversible surgeries.

In addition, PERWAIZ was found guilty in Counts 58 and 59 for false statements involving health care matters due to his lies in his provider reapplications/reattestations to health care insurance companies. These relate to PERWAIZ' lies to the insurance companies regarding his prior federal felony convictions for tax evasion. At trial, the jury saw evidence PERWAIZ falsely stated that he did not have any prior felony convictions, despite these convictions in 1996 in the Eastern District of Virginia. *United States v. Javaid A. Perwaiz*, No. 2:95cr135.

Also, as shown at trial, defendant did not disclose the past revocation of his privileges in the 1980s at Maryview Hospital as was required in these reapplications/reattestations. Maryview Hospital terminated the defendant's staff membership and clinical privileges on or about October 24, 1983, due to poor clinical judgment and unnecessary surgeries, which included numerous unnecessary hysterectomies.

Evidence from two different insurance companies showed that approximately 80% of PERWAIZ' surgeries and procedures were unnecessary.[2] The evidence showed the defendant

---

[2] In fact, this number likely underrepresents the number of fraudulent procedures and surgeries.

personally gained approximately $2,276,089 from his crimes.   In addition, he caused an additional loss to insurance companies of approximately $18,563,323 based on the hospitals bills and collections from his surgeries and procedures that occurred at the hospitals.   Thus, PERWAIZ' fraud caused approximately $20,839,412 in loss to insurance companies.   Plus, the loss to his victims, both physically and emotionally, is immeasurable.

## II.     DEFENDANT'S OBJECTIONS

The defendant continues to refuse to accept responsibility and objects to the PSR's stated offense conduct, victim impact, vulnerable victim, role in the offense, and adjustment for obstruction of justice sections.   He also objects to the Guidelines calculations, loss amount, sophisticated means enhancement and other Guidelines adjustments.   As the Court and jury saw at sentencing, the facts of this case were proved beyond a reasonable doubt and these objections should be sustained.

As for the PSR's factual findings, and specific enhancements and adjustments, the government consulted with the defendant's counsel.   Defendant's counsel stated that, for purposes of sentencing, the Court can rely on the jury's verdict.   Defense counsel believes that the Court's reliance on the jury's verdict is sufficient to support the PSR and the Guidelines calculations.   As such, the defendant and the government do not plan to submit further evidence to support the PSR and the calculations therein.

## III.    STANDARDS GOVERNING SENTENCING

---

This number only considers the number of individual, unique women who had at least one surgery or procedure by PERWAIZ.   It does not include women who had numerous unnecessary surgeries and procedures.   As the evidence showed at trial, PERWAIZ rarely only performed one surgery or procedure; he usually had the victims return again and again for additional surgeries and procedures.

The standards governing sentencing are well-established. In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. *Id.* at 264; *see also United States v. Kimbrough,* 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence"). In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the Section 3553(a) factors, and finally pronounce a sentence considering all of the relevant factors. *Id.* at 49-50. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. App'x 272, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing *United States v. Pauley,* 511 F.3d 468, 473 (4th Cir. 2007)). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the

case." *United States v. Cuthrell*, No. 12-4077, 2012 WL 3643677, *1 (4th Cir. Aug. 27, 2012) (citing *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)).   Ultimately, a court "must state in open court the particular reasons supporting its chosen sentence."   *Carter*, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

IV.   18 U.S.C. § 3553(a) FACTORS

A Guidelines sentence of 600 months is reasonable and appropriate in the instant case. As discussed below, the application of the 3553(a) factors – in particular the nature and circumstances of the offenses, the history and characteristics of the defendant, and the need to promote adequate respect for the law – support the government's requested sentence in this case.

A.   **Nature and Circumstances of the Offense**

The nature and circumstances of this offense are serious and heinous.   Under this factor, there are two aspects the Court needs to consider: 1) the fraud and crime against the health insurance companies, and 2) the fraud and crime against the countless victims who PERWAIZ coerced into unnecessary surgeries and procedures, early inductions, and rushed sterilizations.

In terms of the fraud on the insurance companies, the defendant honed his medical practice over a period of decades to be a cash machine for his lavish lifestyle.   Just a few years after he received his medical degree and license, PERWAIZ was thrown out of Maryview Hospital for performing unnecessary surgeries.   While the Virginia Department of Health then did its own investigation, it only cited PERWAIZ for poor record keeping (as well as having sex with patients, which he admitted during trial that he continued to do).   Instead of getting additional training, PERWAIZ continued to practice on his own.   And, he learned, or attempted

9

to learn, to keep better records to support his unnecessary medical surgeries and procedures. This assisted him in continuing his criminal conduct for decades.

Some of PERWAIZ' medical records, if true, would support the numerous surgeries and procedures. However, the Court knows from trial that very little PERWAIZ wrote down in the medical records was accurate or truthful. Rather, PERWAIZ would rewrite his clinical notes, edit them at a later date, or just write down boilerplate complaints to support his claim to insurance companies for reimbursement. This resulted in millions of dollars of ill-gotten gains to PERWAIZ and a complete fleecing of health insurance companies.

Secondly, and even more serious, is the nature and circumstances of the crime against his individual victims. The majority of PERWAIZ' patients were low-income Medicaid patients. Many were poorly educated. However, there were others who were highly educated and had private insurance. Regardless, the thing the patients all had in common was that they trusted PERWAIZ. They believed what he told them; if they were sick or at risk, they trusted that PERWAIZ was being truthful and had their well-being as his first priority. Thus, they did what he told them to do. They would consent to and show up for unnecessary procedures and surgery, or get induced to have their baby, or to become permanently sterilized (many times with PERWAIZ' false assurance he could easily reverse it in the future). Many of these victims underwent invasive surgeries and procedures and experienced pain and discomfort that goes along with those. The women lost organs and lost their ability to have children. Some experienced permanent, debilitating pain and other complications. And, many of these women lost their trust of the medical establishment and are now hesitant to go to or listen to other doctors.

The Court only heard from some of the patients whom PERWAIZ victimized for his own financial gain. The FBI received hundreds of statements and complaints to their hotline and continue to receive calls from women who believe they are victims. In addition, the U.S. Attorney's Office set up a dedicated website and email address to provide information to women concerning this case. *See https://www.justice.gov/usao-edva/united-states-v-javaid-perwaiz*. Countless women do not know and will never know what PERWAIZ did to them, whether it was necessary or not, or even what surgeries or procedures were done on them. For example, R.D. wrote the government for her records believing she was infertile due to PERWAIZ. Exhibit A, Example Emails to U.S. Attorney's Office[3]. Unfortunately, R.D. is just one of many who is left wondering. *Id.* And most of these women will never know the truth.

Even alone, the nature and circumstances of the offense warrants the requested 600-month sentence.

### B. History and Characteristics of the Defendant

This factor also supports a 600-month sentence. As discussed, the defendant has spent decades defrauding insurance companies at the expense of and without regard to the women he took an oath to heal. And, it is clear that one of his motivating factors was pure and simple greed.

As presented at trial and as stated in the PSR, PERWAIZ was convicted in 1996 for two felony counts of signing and filing false tax statements. Even then, PERWAIZ was using his medical practice as a cash machine to support his expensive tastes. PERWAIZ claimed on his medical practice's tax returns the following, among other items as "business expenses": a

---

[3] Note these are separate and apart from the Victim Impact Statements provided to the Court.

$84,942 Ferrari sportscar, a $26,120 Mercedes 560SL car, oriental rugs, china, jewelry, furniture, stereo equipment, paintings, lingerie, shoes, and suits. *See* Govt. Trial Ex. 152A. Unfortunately for countless women, these two felony convictions did nothing to stop the defendant.

Instead, PERWAIZ continued to run up his billings and receipts by convincing vulnerable, trusting women into unnecessary, often-times painful procedures and surgeries. He did this without remorse or hesitation. He did so, in part, to pay for his mistress' children to go to private school and college. He also bought the mistress jewelry and watches, and bought himself over $70,000 in sunglasses and over $817,000 at Bergdorf Goodman in luxury items.

This Court saw PERWAIZ on the stand when he testified at the trial. He is obviously an intelligent man, but also an arrogant, indignant man who lied to the Court and the jury, and blamed everyone but himself for the damage he caused to these women. He even blamed and continues to blame the victims. And, since the conviction, PERWAIZ has shown his true colors about what he really things of his patients and victims.

As the Court is aware, the defendant has been detained at Western Tidewater Regional Jail. All of his phone calls, video visits, and text messages are recorded. As the government will present at sentencing, on March 31, 2021, PERWAIZ was speaking with his girlfriend, Erika Smith, concerning the civil medical malpractice suits pending against him. He told her, "It's all going to get settled. These people are going to make a lot of money – all these vultures, all these blacks from Portsmouth, because of my criminal conviction…" PERWAIZ continued that he trusted these people and they have really hurt <u>him</u>. The patients always told him how handsome he was and wanted to hug him. PERWAIZ also said his malpractice attorney assured

PERWAIZ that he "didn't do anything wrong" and these people are going to get paid "for absolutely nothing. These people are perfectly fine people. No complications during, after surgery. Nothing. Except that 'I'm still in pain. My incision looks this, my this, my that.'"

Based on who PERWAIZ has been over a period of decades, and continues to be, this factor also supports the 600 month sentence.

### C. Promote Respect for the Law and Adequate Deterrence to Criminal Conduct

A lengthy sentence of imprisonment also will promote respect for the law. Due to PERWAIZ' age, the length of time he is facing, and his loss of medical license, specific deterrence is not necessarily the largest factor weighing in favor of the requested sentence. However, general deterrence is a significant factor for the Court to consider in fashioning a sentence of imprisonment.

In particular in a case such as this, the Court must send a message to the medical community and those in positions of trust that this criminal conduct will not be tolerated. As discussed by the sentencing judge in the Bernie Madoff case, the deterrent effect of sentencing includes a symbolic aspect. *See* Ex. B at 48, Madoff Sentencing Transcript. As here, "the strongest possible message must be sent to those who would engage in similar conduct that they will be caught and that they will be punished to the fullest extent of the law." *Id.*

In addition, the victims in this case deserve the strongest possible message. This Court has received over 50 Victim Impact Statements, both from some of the women who testified at trial as well as others.[4] The Court cannot give these women back their health or trust in doctors.

---

[4] In addition, several victims have expressed their wish to address the Court in person at sentencing concerning the impact of PERWAIZ' actions.

13

However, a strong message to the defendant and others in the form of a 600-month sentence may give them a sense of trust in the justice system and "may, in some small measure, help these victims in their healing process." Ex. B at 50.

### D. The Kinds of Sentences Available

PERWAIZ' criminal conduct and this case is unique, to say the least. However, the government believes there are at least one case the Court should consider in fashioning an appropriate sentence.

*United States v. Fata* was a criminal case from the Southern District of Michigan. *United States v. Fata*, 2:13cr20600 (S.D.Mich.). In 2014, Fata pleaded guilty pursuant to a plea agreement and was convicted of conspiracy, health care fraud resulting in serious bodily injury, and money laundering. Fata was an oncologist. The fraud involved, in part, Fata routinely diagnosing patients with cancer, when in fact they did not have cancer, in order to treat them and bill the insurance companies. *Id*. at ECF No. 135. He was paid over $17 million for these fraudulent treatments, all while putting his patients at great risk. The government identified over 550 victims. His Guidelines were Life, with a statutory maximum of 175 years (2,100 months). The Court sentenced Fata to 45 years' (540 months) imprisonment. Fata was approximately 50 years old at the time. Unlike PERWAIZ, Fata expressed remorse for his conduct and acknowledged the harm he caused the patients who trusted him. *See* https://www.detroitnews.com/story/news/local/oakland-county/2015/07/10/farid-fata/29955103/.

In contrast to the *Fata* defendant, PERWAIZ proceeded to trial. Further, PERWAIZ continues to refuse to accept responsibility. And, his Guidelines are almost triple that of *Fata*. While the *Fata* case is not a perfect comparison, the government believes it supports the fact that

14

the requested 600 month sentence of imprisonment is reasonable, sufficient, and not greater than necessary to achieve the purposes of sentencing.

## V. CONCLUSION

For the foregoing reasons, the Government submits that a sentence of 600 months would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully Submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Elizabeth M. Yusi
E. Rebecca Gantt
John F. Butler
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - elizabeth.yusi@usdoj.gov
E-Mail Address – rebecca.gantt@usdoj.gov
E-Mail Address – john.f.butler@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of May, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

I FURTHER CERTIFY that on this this 11th day of May, 2021, I caused a true and correct copy of the foregoing to be e-mailed to the following:

Sami Geurts
United States Probation Officer

By: _____/s/_____
Elizabeth M. Yusi
Assistant United States Attorney